**NATIONAL PATENT DEVELOPMENT CORPORATION, Appellant**

v.

**T.J. SMITH & NEPHEW LIMITED.**

No. 88–7062.

United States Court of Appeals, District of Columbia Circuit.

June 16, 1989.

C. Frederick Leydig, Jeffrey S. Ward, and John P. Bundock were on the suggestion for rehearing en banc of appellant.

Albert L. Jacobs, Jr., Mark H. Sparrow, and Stephen M. Haracz were on the reply to the suggestion for rehearing en banc.

Before WALD, Chief Judge, ROBINSON, MIKVA, EDWARDS, RUTH BADER GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

Concurring opinion filed by Circuit Judge SILBERMAN.

ON SUGGESTION FOR
REHEARING EN BANC.

RUTH BADER GINSBURG, Circuit Judge:

This appeal calls on us to decide whether a federal long-arm statute, 35 U.S.C. § 293

(1982), authorizes the district court to exercise personal jurisdiction over a foreign holder of United States patents in a suit over ownership of those patents. Section 293 prescribes that the United States District Court for the District of Columbia shall have personal jurisdiction over a nonresident patentee in order "to take any action respecting the patent or rights thereunder." A panel of this court, constrained by circuit precedent, held that section 293 does not extend to a patent ownership dispute. *National Patent Development Corp. v. T.J. Smith & Nephew, Ltd.*, 865 F.2d 353 (D.C.Cir.1989). Two members of the panel, however, stated that the controlling precedent was "misconceived" and suggested that the full court might consider overruling it. *Id.* at 359 (Ruth B. Ginsburg, J., concurring). Upon en banc review, we now vacate the panel decision and hold that 35 U.S.C. § 293 empowers the district court to assert personal jurisdiction over a foreign holder of U.S. patents in a dispute over the patents' ownership.

### I.

In 1967, appellant National Patent Development Corporation (National), a Delaware corporation with its principal place of business in New York, entered into a series of agreements with SANACO, a British corporation, pursuant to which National and SANACO formed Hydron Limited, a British corporation owned in equal shares by National and SANACO. This joint venture was designed to link SANACO's expertise in research and development of health care products with National's patent rights relating to hydrophilic polymers; the parties agreed that the results of Hydron's research, including any patent rights, were to be the property of Hydron—and thus of National and SANACO in equal parts.

Subsequent to those agreements, in 1968 and 1969, applications for British and U.S. patents relating to adhesive wound dressings were filed in the names of SANACO subsidiaries.[1] In 1970, National and SANACO executed another agreement which modified the earlier agreements. The 1970 agreement provided that, notwithstanding the 1967 contracts, the adhesive wound dressing patents resulting from the 1968–69 applications would be the property of another British subsidiary of SANACO, appellee T.J. Smith & Nephew Limited, not of Hydron. Pursuant to the 1970 agreement, Smith & Nephew became the owner of U.S. Patent No. 3,654,835, which was granted in 1972. That patent was reissued in 1985 as U.S. Reissue Patents Nos. 31,886 and 31,-887.

In January 1987, National sued Smith & Nephew in the United States District Court for the District of Columbia, seeking a declaratory judgment that National has a one-half ownership interest in the reissue patents. National alleged that SANACO and Smith & Nephew had concealed the commercial value of the wound dressing applications and had procured National's agreement to the terms of the 1970 contract through fraud and breach of contractual and fiduciary obligations. National asked the district court to declare that Smith & Nephew held the allegedly misappropriated patents in trust for Hydron and to assign all rights, title, and interest in the patents to Hydron.

Subject matter jurisdiction over National's suit was based solely on diversity of citizenship and an amount in controversy in excess of $10,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a) (1982).[2] National claimed that the district court had personal jurisdiction over Smith & Nephew on the basis of 35 U.S.C. § 293, which provides:

> Every patentee not residing in the United States may file in the Patent and Trademark Office a written designation stating the name and address of a person

---

**1.** Patent applications were also filed in the name of appellee T.J. Smith & Nephew Limited, one of the SANACO subsidiaries, in eighteen other countries.

**2.** National's complaint was filed January 14, 1987. For civil actions filed after May 18, 1989, $50,000 replaces $10,000 in the section 1332(a) amount-in-controversy prescription. Judicial Improvements and Access to Justice Act, Pub.L. No. 100–702, § 201, 102 Stat. 4642, 4646 (1988).

residing within the United States on whom may be served process or notice of proceedings affecting the patent or rights thereunder. If the person designated cannot be found at the address given in the last designation, or if no person has been designated, the United States District Court for the District of Columbia shall have jurisdiction and summons shall be served by publication or otherwise as the court directs. The court shall have the same jurisdiction to take any action *respecting the patent or rights thereunder* that it would have if the patentee were personally within the jurisdiction of the court.

(Emphasis added.)

The district court, relying upon two precedents of this circuit, *Neidhart v. Neidhart S.A.*, 510 F.2d 760 (D.C.Cir.1975), and *Riker Laboratories, Inc. v. Gist–Brocades N.V.*, 636 F.2d 772 (D.C.Cir.1980), and one district court decision, *North Branch Products, Inc. v. Fisher*, 179 F.Supp. 843 (D.D.C.1960), *rev'd on other grounds*, 284 F.2d 611 (D.C.Cir.), *cert. denied*, 365 U.S. 827, 81 S.Ct. 713, 5 L.Ed.2d 705 (1961), dismissed the complaint for lack of personal jurisdiction. Specifically, the district court ruled that National's suit, which claimed breach of contract, fraud, and breach of fiduciary duty, was not an "action respecting the patent or rights thereunder" within the meaning of section 293.

On appeal, a panel of this court affirmed the district court's judgment. *Neidhart* and *Riker*, the panel agreed, held that section 293 provides a basis for personal jurisdiction over a nonresident patentee only "if the complaint shows that the court will be obliged to resolve an issue of patent law." *National Patent*, 865 F.2d at 357. Because this suit, essentially a dispute over patent ownership, involves no issue of patent law, "no matter how broadly defined," the panel concluded that circuit precedent required dismissal of the complaint. *Id.*

Two judges on the panel stated in a separate concurrence that "[w]ere this court writing on a clean slate," they would read section 293 to encompass a suit over patent ownership. *Id.* at 358 (Ruth B. Ginsburg, J., concurring). The author of the panel opinion, too, indicated that absent the constraint of circuit precedent, he might construe section 293 more broadly. 865 F.2d at 357 (Silberman, J.) ("If this case came to us without circuit precedent, we would find [the *Neidhart* dissent's] analysis appealing, if not compelling.").

National then petitioned for rehearing en banc. We granted that petition and, upon consideration by the full court,[3] we now vacate the panel's decision, reverse the district court's judgment, and remand for further proceedings.

## II.

The genesis of the existing narrow construction of section 293 is the opinion of the district court in *North Branch*. In that case, the district court stated that it lacked jurisdiction under section 293 over a suit by a U.S. corporation seeking a judgment declaring that it, and not the defendant, a resident of Canada, owned certain U.S. patents.[4] The court believed that the statutory phrase " 'proceedings affecting the patent or rights thereunder'[5] ... should be

---

[3] Because the issue was clearly framed in the panel opinions, circuit precedent, and the parties' filings for and against the suggestion for rehearing en banc, we decided that further briefing and oral argument before the entire court were unnecessary. *Cf. Irons v. Diamond,* 670 F.2d 265, 268 n. 11 (D.C.Cir.1981) (introducing "*Irons* footnote" method of allowing the full court to resolve an apparent conflict between prior decisions in the context of a panel's consideration of a case and without further briefing and oral argument).

[4] *North Branch*'s discussion of section 293 is dictum. After declaring that it lacked jurisdiction under section 293, the court observed that the defendant had submitted to the court's jurisdiction by filing a permissive counterclaim. 179 F.Supp. at 846. The court nevertheless dismissed the suit, on its own motion, on the ground of forum non conveniens. *Id.*

[5] The district court in *North Branch* and this court in *Neidhart* and *Riker* focused on the phrase "proceedings affecting the patent or rights thereunder" in section 293 rather than on the subsequent language, "any action respecting the patent or rights thereunder." The latter language is the relevant portion of section 293

construed as synonymous with 'actions under the patent laws of the United States' [*i.e.*, actions within the compass of 28 U.S. C. § 1338(a) ] and, therefore, should be limited and restricted to actions for infringement of patents and actions for declaratory judgments to adjudicate the validity or infringement of patents." 179 F.Supp. at 845–46.[6] Because a suit over patent ownership does not fit that confined category, the court held section 293 inapplicable.

The court's rationale in *North Branch* was twofold. First, although it found section 293's legislative history unenlightening, the court stated: "The fact that the Section is included in the codification of laws relating to patents [Title 35] would seem to lead to the conclusion that the Section should be construed as being limited to actions under the patent laws, rather than extended to all actions affecting patents generally." *Id.* at 845. Second, the court feared "a possible lack of any constitutional basis for jurisdiction either over the subject matter or the person, if such a suit were not brought either under the patent laws or under the provision relating to diversity of citizenship." *Id.*

This court first addressed the scope of section 293 in *Neidhart*. That case consisted of two consolidated actions. In one, a United States citizen alleged that the defendant, a Swiss corporation, had breached an agreement giving the plaintiff the exclusive right to award sublicenses under the defendant's U.S. patents. The plaintiff sought a judgment declaring the validity of, and modifying, the agreement, establishing his entitlement to royalties, and enjoining the defendant from interfering with his sublicensing. In the companion case, a Maryland corporation charged that a Canadian corporation had breached an agreement giving the plaintiff an exclusive territorial use license of the defendant's U.S. patents. The plaintiff sought a judgment declaring the existence and validity of the

license, an order directing specific performance, an injunction preventing the defendant from granting conflicting licenses, and damages.

This court, announcing its essential agreement with the *North Branch* rationale, held that license agreement controversies were not "among the situations embraced by section 293." *Id.* at 764. The court added the qualification, however, that it "would not go so far as to say that 28 U.S.C. § 1338(a) and 35 U.S.C. § 293 are synonymous." *Id.* Furthermore, unlike the district court in *North Branch*, the *Neidhart* court drew on the statute's legislative history. That history, the court said, showed that Congress intended section 293 to refer to suits concerning the validity or infringement of patents. "The least that may be adduced from the legislative history," the court continued, "is that Congress most assuredly did not contemplate application of section 293 to actions to determine license rights." *Id.* at 763. Such actions, the court concluded, "while termed patent license agreement controversies, are, quite simply, contract disputes.... We see no reason to bring such matters within the realm of the federal judiciary, nor do we think Congress intended such a result." *Id.* at 764–65.

Judge Leventhal dissented in *Neidhart*. He maintained that the natural meaning of the words "proceedings affecting the patent or rights thereunder"—written, critically, in the disjunctive—encompasses a proceeding to determine the validity of, or the extent of rights granted by, a license. *Id.* at 766 (Leventhal, J., dissenting). The broad language of section 293, Judge Leventhal stated, should not "be construed in the same way as the distinctly different language of 28 U.S.C. § 1338," for section 1338 "entail[s] an *exclusive* grant of subject matter jurisdiction to the Federal courts and a corresponding removal from the state courts," whereas section 293 is

---

for our purposes, however, because that phrase specifically prescribes the scope of the district court's jurisdiction. Nothing consequential turns on this point, however.

**6.** 28 U.S.C. § 1338(a) provides in relevant part:

The district courts shall have original jurisdiction of any civil action arising under any Acts of Congress relating to patents.... Such jurisdiction shall be exclusive of the courts of the states....

simply remedial, *i.e.*, designed to assure a forum for suit in the United States in cases that otherwise might not be accommodated by either state or federal courts. *Id.* The purpose behind section 293, Judge Leventhal reasoned, was "to cope with the problem that nonresidents could obtain valuable United States patent rights, and yet stay beyond the reach of both state and Federal process." *Id.*

The final episode, until now, in the trilogy of section 293 cases was *Riker.* In *Riker,* Gist–Brocades, a Netherlands corporation, had licensed Riker Laboratories, a United States corporation, to make, use, and sell Gist–Brocades' patented products. As part of the licensing agreement, Riker was required to use a Gist–Brocades trademark and to develop and hold in trust for Gist–Brocades two other trademarks. When the agreement was terminated or the patent expired, Riker was to assign all its right, title, and interest in the trademarks to Gist–Brocades. Another provision also required Riker to pay royalties after the expiration of the patent for use of the trademarks.

While the agreement was still in effect, Riker's competitors began infringing Gist–Brocades' patent and cutting into Riker's sales. Riker requested that Gist–Brocades amend the licensing agreement to delete the trademark tie-in and post-patent royalty provisions, contending that those provisions constituted patent misuse, in violation of United States antitrust laws, and prevented enforcement of the patent against infringers. When Gist–Brocades refused, Riker cancelled the agreement, citing the anti-trust problems. Riker then sued Gist–Brocades, requesting declaratory, injunctive, and monetary relief.

This court held that the district court had personal jurisdiction over Gist–Brocades under section 293 because Riker's allegation of patent misuse "embraces the patent laws directly." 636 F.2d at 778. The concept of patent misuse, the court explained, developed as an equitable defense to a suit for patent infringement: if a patentee had misused its patent to establish a monopoly over an unpatented article, for example,

courts would refuse to enforce the patent against an infringer affected by the misuse. *Id.* at 776–77. "If a patentee cannot enforce his patent by means of an infringement action to protect his licensees, the conclusion is inescapable that 'rights' under the patent, including the right to maintain an infringement action, are affected." *Id.* at 777.

The *Riker* court thus distinguished the consolidated actions in *Neidhart* as "essentially contract disputes, only incidentally involving patents"; "there, the only relation to the patent laws was the fact that the center of [each] *contract dispute* happened to be a patent rather than some other subject." *Id.* at 778 (emphasis in original). Although "the genesis of the dispute" in *Riker* also was a license agreement, "the heart of the dispute," this court said, "[did] not involve mere license terms but the effect under the antitrust laws of the terms of the patent license on rights under the patent." *Id.* at 779.

The panel in this case reconciled *Neidhart* and *Riker* by holding that section 293 is applicable "if the complaint shows that the court will be obliged to resolve an issue of patent law." 865 F.2d at 357. National's action does not require resolution of any patent law issues; instead, it presents only claims of fraud and breach of contractual and fiduciary duties. The panel therefore held that *Neidhart* controlled and that section 293 was inapplicable.

### III.

We conclude that this court embarked on the wrong course in *Neidhart,* and that Judge Leventhal's dissent in that case correctly construes section 293. The statutory language broadly authorizes the assertion of jurisdiction over a nonresident owner of a U.S. patent in cases "respecting the patent *or rights thereunder.*" 35 U.S.C. § 293 (emphasis added). A suit over patent ownership surely respects or affects rights under a patent: if one does not own a patent, one certainly lacks the rights of a patentee. In this regard, a suit over patent ownership affects rights under the patent at least as much as a suit claiming patent

misuse, and does so more permanently, as a patentee that misuses a patent may regain patent rights "after the misuse is purged." *Riker*, 636 F.2d at 777.

The court in *Neidhart* disregarded the recognized natural meaning of the statutory language on the ground that " '[n]atural meaning' simply will not suffice where, as here, other considerations necessitate more sophisticated interpretation." 510 F.2d at 764 n. 9. We see no such "other considerations" and thus no cause to depart from "the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself"; "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed. 2d 766 (1980); *accord Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981); *Diamond v. Diehr*, 450 U.S. 175, 182, 101 S.Ct. 1048, 1054, 67 L.Ed.2d 155 (1981); *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979).

Smith & Nephew urges that the legislative history supports *Neidhart*'s parsimonious reading of section 293. We disagree. The sparse legislative history is of little help in reconstructing Congress' intent. *See Riker*, 636 F.2d at 775–76 (stating that "the Congressional reports do not brilliantly illuminate the Congressional intent"); *North Branch*, 179 F.Supp. at 845 ("Nei-

ther the legislative history nor the Committee Reports throw any light on the question here presented."). If anything, however, that history might fairly be read to support a more generous construction of the statute. The most telling piece of history is a comment by the Department of State at a House hearing on what became section 293:

> The Department understands that this provision has been added for the benefit of American residents desiring to bring action against foreign owners of United States patents. At the present time American manufacturers threatened by charges of infringement of United States patents by persons resident abroad are *especially* handicapped by inability to bring suit for declaratory judgment.

Hearings on H.R. 3760 Before the Subcomm. No. 3 of the House Comm. on the Judiciary, 82d Cong., 1st Sess. 91 (1951) (emphasis added); *see also id.* at 93 (similar statement by Chief of the Patent Litigation unit of the Department of Justice).[7] As Judge Leventhal observed, this statement indicates that although "American manufacturers threatened with charges of infringement are identified as being 'especially handicapped' by present lack of service capability, . . . they were not the sole beneficiaries of the legislation." *Neidhart*, 510 F.2d at 767 (Leventhal, J., dissenting).

Perhaps the prime consideration motivating the *Neidhart* majority was its fear that a less restrictive reading of section 293 would "abrogate the traditional separation

---

**7.** There were no hearings in the Senate. The House and Senate Reports are unhelpful, stating only that "[s]ection 293 is a new section that is needed on some occasions to obtain jurisdiction over foreign patent owners that do not reside in the United States." H.R.Rep. No. 1923, 82d Cong., 2d Sess. 10 (1952); S.Rep. No. 1979, 82d Cong., 2d Sess. 9 (1952), U.S.Code Cong. & Admin.News 1952, pp. 2394, 2403. The committee reports do not explain, however, on what "occasions" such jurisdiction is necessary, leaving us where we began: with the statutory language. *See Neidhart*, 510 F.2d at 767 (Leventhal, J., dissenting).

The majority in *Neidhart* found that these reports "characterize section 293 as being part of 'a group of sections relating to remedy for infringement of a patent.'" 510 F.2d at 762 (emphasis omitted). We believe Judge Leven-

thal's dissent aptly refuted the majority's reading. The passage in question states: "Beginning with 281 is a group of sections relating to remedy for infringement of a patent, the suit in courts." H.R.Rep. No. 1923, *supra*, at 10; S.Rep. No. 1979, *supra*, at 8, U.S.Code Cong. & Admin.News 1952, p. 2402. A description of those sections follows in numerical order. As Judge Leventhal stated, however, that "group of sections" "plainly stops before section 292—a *criminal* statute for falsely marking an article as patented." 510 F.2d at 767 (Leventhal, J., dissenting). To read the passage's opening sentence as encompassing section 293 logically requires reading it as including section 292, but section 292 plainly does not relate to redress for infringement. We therefore do not find the featured passage supportive of the *Neidhart* majority's narrow construction of section 293.

of state court-federal court jurisdiction whenever a nonresident patentee is involved." 510 F.2d at 764. That fear was misplaced. It apparently stemmed from the district court's confusion in *North Branch* of the discrete concepts of subject matter jurisdiction and personal jurisdiction. The judge in *North Branch* seemed to believe that the plaintiff there had invoked section 293 not only to establish personal jurisdiction over the non-resident defendant, but also to establish district court authority over the subject matter of the suit, despite the absence of a patent law issue or of the allegations necessary to establish diversity of citizenship. *See* 179 F.Supp. at 845 ("While it is alleged that the defendant is a resident of Alberta, Canada, it is not averred that he is a citizen of Alberta, Canada. So too, there is an absence of any allegation as to the jurisdictional amount."). In fact, however, although there was no federal question claim in *North Branch*, and diversity of citizenship was imperfectly pleaded, the court did have subject matter jurisdiction: in those pre-District of Columbia Court Reorganization Act days, the district court served as a general trial court for the District of Columbia, and so had common law and equity jurisdiction much like that of a state court of general jurisdiction. *See Neidhart*, 510 F.2d at 767 n. 11 (Leventhal, J., dissenting).

In *Neidhart*, the Department of Justice contributed to the confusion by suggesting that section 293 indeed did confer both subject matter and personal jurisdiction on the district court over patent-related cases. In response, the *Neidhart* majority emphasized its resistance to allowing the district court to intrude on the domain of state courts by asserting jurisdiction over what were, in essence, contract disputes. 510 F.2d at 764.

When one addresses subject matter and personal jurisdiction separately, however, the *Neidhart* and *North Branch* courts' concern largely vanishes. Section 293 does not supply subject matter jurisdiction; that fundamental competence must be based, ordinarily, on diversity of the parties' citizenship, *see Neidhart*, 510 F.2d at 765 (Leventhal, J., dissenting), or on a federal question, *see Riker*, 636 F.2d at 779–80. Interpreting section 293 in accord with its natural meaning, then, would not allow the United States District Court for the District of Columbia to encroach on the domain of state courts, because that federal court would be limited by the normal subject matter competence requirements.

The district court clearly possessed subject matter jurisdiction over this case based on the parties' diverse citizenship and the requisite amount in controversy. *See* 28 U.S.C. § 1332(a); *see also supra* note 2. Furthermore, to the extent National's claims relate to patents Smith & Nephew registered in the United States,[8] due process would not have inhibited the district court's assertion of personal jurisdiction over Smith & Nephew. By registering a patent in the United States Patent and Trademark Office, a party residing abroad purposefully avails itself of the benefits and protections patent registration in this country affords. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *cf. Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200, 203–04 & nn. 4–6 (D.C.Cir. 1981).[9] It is therefore fair and reasonable to require such a party to respond here— *i.e.*, in federal court in our nation's capital, where the party has registered its patents

8. National's complaint, which alleges that Smith & Nephew also misappropriated National's rights in the relevant inventions by filing applications in Great Britain and eighteen other countries, would have to be trimmed so that the issues before the district court concern only the U.S. patents and rights thereunder.

9. Smith & Nephew has at least four times availed itself of its rights under United States patent registrations by seeking to enforce the

patents against infringers. *See T.J. Smith & Nephew Ltd. v. Ferris Corp.*, No. 86 C 5461 (N.D.Ill. filed July 25, 1986); *T.J. Smith & Nephew Ltd. v. Pfizer Hosp. Prods. Group, Inc.*, No. 85–301 (D.Del. filed May 20, 1985); *T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc.*, 645 F.Supp. 206 (N.D.N.Y.1986), *aff'd*, 821 F.2d 646 (Fed.Cir.1987); *T.J. Smith & Nephew Ltd. v. Parke, Davis & Co.*, 623 F.Supp. 808 (D.Utah 1985).

—in proceedings, whether arising under federal or state law, concerning the U.S.-registered patent.

Finally, Smith & Nephew argues that we should eschew a "plain language" or "natural meaning" approach because an expansive interpretation of section 293 would render the provision unconstitutionally vague. Smith & Nephew's Reply to National's Suggestion for Rehearing en Banc at 7–8. For support, Smith & Nephew cites the panel's remark that under a plain language approach, "we would face problems in defining the outer boundary of jurisdiction. How tangential or remote to the core dispute could be patent be and still authorize use of the long-arm statute?" *National Patent*, 865 F.2d at 357. Recognizing the need for, and potential difficulty of, line-drawing, however, does not spell vulnerability to a void-for-vagueness plea. Deciding whether a statutory term encompasses the facts of a given case is a routine part of the business of appellate judging. We thus consider this bench adequately equipped to determine the boundaries of the term "action respecting the patent or rights thereunder" when the need arises. Today we decide only that a suit over patent ownership falls comfortably within those boundaries.

### Conclusion

35 U.S.C. § 293 authorizes the assertion of personal jurisdiction by the United States District Court for the District of Columbia over a nonresident patentee in a suit over patent ownership. We therefore vacate the decision of the panel, reverse the decision of the district court, and remand this case to the district court for further proceedings consistent with this opinion.

*It is so ordered.*

SILBERMAN, Circuit Judge, concurring:

I concur in the court's opinion, including its unwillingness to explore the outer boundaries of the statute's reach—which, as I mentioned in the panel opinion, are not readily apparent. *Compare Michigan Citizens For An Independent Press v. Thornburgh*, 868 F.2d 1285, 1293–94 (D.C.Cir.), *cert. granted,* — U.S. ——, 109 S.Ct. 1952, 104 L.Ed.2d 421 (1989) *with* 868 F.2d at 1299 (R. Ginsburg, J., dissenting). But I voted against putting the issue to the *en banc* court, because I thought we could abide by the fifteen-year-old *Neidhart* opinion. I continue to ponder[1] my colleagues' disposition so readily to *en banc* cases, including those based on settled precedent. *See, e.g., Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir.1988) (en banc).

Of course, as it turns out, we are unanimous in our decision, so this case cannot be described as an "apparent ideological use of *en banc* review" according to a recent political polemic in the *Harvard Law Review. See* Note, *The Politics of En Banc Review,* 102 HARV.L.REV. 864 (1989). That simplistic concept, as defined in the note, turns on the identity of the President who appointed all of the judges in the majority of an *en banc* vote. I do not, however, think that factor should weigh one way or the other in determining whether we should afford *en banc* review.

---

1. Perhaps I have been too parsimonious.