[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11415

_____

JEKYLL ISLAND-STATE PARK AUTHORITY,

Plaintiff-Appellant,

*versus*

POLYGROUP MACAU LIMITED,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:21-cv-00008-LGW-BWC

_____

Before ROSENBAUM, LAGOA, and WILSON, Circuit Judges.

WILSON, Circuit Judge:

In this case, we must decide whether a federal district court may exercise personal jurisdiction over Defendant-Appellee Polygroup Macau Limited (Polygroup Macau), an intellectual property holding company registered and headquartered in the British Virgin Islands (BVI).

Plaintiff-Appellant Jekyll Island State Park Authority (Jekyll Island) is a Georgia entity that operates the Summer Waves Water Park and owns a federally registered trademark for the words SUMMER WAVES. In 2021, Jekyll Island discovered that Polygroup Macau had registered nearly identical SUMMER WAVES marks, after Polygroup Macau's general counsel asked to buy Jekyll Island's domain name—summerwaves.com. Jekyll Island sued for trademark infringement and to cancel Polygroup Macau's marks.

Polygroup Macau moved to dismiss for lack of personal jurisdiction. Although the district court noted it was "a fairly close case," it concluded that because Polygroup Macau did not sell products in the United States using its trademarks—it only permitted other entities to do so—the "causal connection" between Polygroup Macau's activities in the United States and Jekyll Island's trademark claims was too "attenuated" to support personal jurisdiction. No. 21-CV-8, 2023 WL 2632813, at *11 (S.D. Ga. Mar. 24, 2023).

We disagree. Personal jurisdiction does not require "a strict causal relationship between the defendant's in-state activity and the litigation." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S.

351, 362 (2021). Because Polygroup Macau has purposefully availed itself of the benefits of United States law to protect its substantial portfolio of intellectual property, a federal court may hold it "to account for related misconduct." *Id.* at 360. And the connection between Jekyll Island's trademark infringement claims and Polygroup Macau's activities in the United States is "close enough to support specific jurisdiction." *Id.* at 371.

After careful review, and with the benefit of oral argument, we reverse the district court's dismissal of Jekyll Island's claims and remand for consideration on the merits.

## I.    Background

### A.  *Factual History*[1]

Jekyll Island is an entity created by the state of Georgia to oversee and manage Jekyll Island State Park. Since 1988, Jekyll Island has operated Summer Waves Water Park on the island and sold branded merchandise. In 1990, Jekyll obtained a federal trademark registration for SUMMER WAVES, Registration No. 1,593,514. Beginning in 2001, Jekyll Island advertised the park and sold SUMMER WAVES-branded merchandise nationwide on its website, www.summerwaves.com.

Polygroup Macau is an intellectual property holding company incorporated and registered in the BVI. In 2015, Polygroup

---

[1] To the extent the parties' statements conflict, we construe all reasonable inferences in favor of Jekyll Island. *See, e.g., Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010).

Macau registered trademarks for SUMMER WAVES, Registration No. 4,862,983; SUMMER WAVES 3D, Registration No. 5,050,873; and SUMMER WAVES ELITE, Registration No. 4,862,985, for use on recreational pools and pool-related products.[2]

Polygroup Macau is not a revenue-generating entity. It does not engage in customer sales anywhere in the world. It does not use the SUMMER WAVES marks or any other trademarks in United States commerce or anywhere else in the world. Polygroup Macau does not directly sell products into the United States, own property in the United States, have bank accounts in the United States, or pay taxes in the United States.

Polygroup Macau maintains that its "only role within the group of related Polygroup companies is holding certain intellectual property assets, including [Polygroup Macau's] federally registered United States SUMMER WAVES marks, and making these assets available for use by other related Polygroup Companies."

### i. The Polygroup Member Companies

Polygroup Macau is a wholly owned subsidiary of Polygroup Asia Pacific Limited (another BVI company). Polygroup Asia Pacific Limited oversees a group of related "Polygroup" entities that manufacture and distribute consumer goods.

---

[2] The trademarks for SUMMER WAVES 3D and SUMMER WAVES ELITE were cancelled because Polygroup Macau did not file an acceptable declaration of use or non-use between the fifth and sixth year after registration as required by the Lanham Act. *See* 15 U.S.C. §§ 1058, 1141k.

Polygroup Asia Pacific Limited is wholly owned by the Cheng Chung Wai (Paul Cheng) Family Trust. Paul Cheng and his two sons, Lewis and Elmer Cheng, oversee the Polygroup family of companies. Lewis and Paul Cheng are officially Polygroup Macau's directors (though Elmer has signed several trademark agreements and declarations as a director).

The Polygroup "family of companies" (collectively, Polygroup) "includes factories and operations in China, Thailand, Europe and the United States."[3] Polygroup employs more than 15,000 people, distributes products in more than fifty countries, and oversees manufacturing operations in Asia, Europe, and North America. Its "award-winning product portfolio" is "sold through mass retailers across 50+ countries."[4]

Polygroup represents itself as a unified brand on its websites, social media pages, and products.[5] The Polygroup entities are represented by a shared general counsel, who is barred in Georgia. He describes Polygroup as "a privately run small group" that is "very collegial[ly] run."

The Polygroup companies conduct business in the United States through Polygroup Services N.A. Inc. (Polygroup Services),

---

[3] *About Us*, Polygroup, https://perma.cc/EV88-XX5G.

[4] *Our Story*, Polygroup, https://perma.cc/XJD8-6GPH.

[5] *See, e.g.*, *Polygroup*, https://perma.cc/J3QU-65C5 ("As used herein, 'Polygroup®' refers to our brand and not to any single or particular company within the Polygroup® family of companies.").

another wholly owned subsidiary of Polygroup Asia Pacific Limited. Polygroup Services is a Delaware corporation with an office in Georgia and a distribution facility in Texas. Polygroup Services "assists" the other entities in the group with their business needs in the United States. In 2017, an employee of Polygroup Services signed a trademark assignment contract as Polygroup Macau's Senior Vice President and "Head of North American Operations."

Polygroup Macau has one wholly owned subsidiary, Polygroup Limited Macau Commercial Offshore (Polygroup MCO), which is incorporated in Macau. Polygroup MCO pays Polygroup Macau an annual "management service fee." Polygroup MCO sells products and transfers title to various global retailers. The global retailers then bring the products to the markets of their choice, including the United States.

### ii.  *Polygroup Macau's Trademarks*

Polygroup Macau owns the intellectual property used by the other Polygroup entities, including the POLYGROUP trademark. *See* Registration No. 3,790,951. Polygroup Macau has filed more than seventy trademark applications and at least thirty-four patent applications in the United States Patent and Trademark Office (USPTO). It currently owns more than thirty active trademarks. The marks' registration pages, including the SUMMER WAVES and POLYGROUP marks, all list the same Atlanta-based law firm as the attorneys of record.

Polygroup Macau has been a party to at least thirty-four patent and trademark lawsuits in U.S. courts. Polygroup Macau has

been the sole plaintiff in at least four suits to enforce its intellectual property rights, though never to enforce its SUMMER WAVES trademarks. As a plaintiff in those suits, Polygroup Macau pled that it "marketed, distributed and sold" products in the United States. But just six days after filing one complaint, when a defendant countersued, Polygroup Macau claimed that it never sold or distributed products in the United States.[6]

Polygroup Macau does not have its own budget for trademark registration fees or litigation fees. The "revenue-generating" Polygroup companies, including Polygroup Services and Polygroup MCO, provide the funds on a case-by-case basis, "depending on location." Polygroup Macau hired the same Atlanta-based law firm to assist with its various trademark registrations and litigation. As of August 2020, the firm was listed as the attorney of record for thirty-one active Polygroup trademarks, including the Polygroup name itself. Its SUMMER WAVES trademark applications lists attorneys barred in Georgia, Ohio, Virginia, New York, New Jersey, and California.

---

[6] The district court was "troubled by [Polygroup Macau's] conflicting messages in other cases regarding whether it conducts business in the United States; the messages are seemingly dependent on [Polygroup Macau's]'s status as plaintiff or defendant." 2023 WL 2632813, at *17. According to Polygroup Macau, all of these statements were "mistakes," and not binding in this case. The district court noted these "mistakes" by Polygroup Macau "amount at least to negligence, particularly because [Polygroup Macau] is represented by experienced and sophisticated counsel." *Id.*

Apart from the SUMMER WAVES marks, Polygroup Macau has entered various licensing and purchase agreements with United States companies for its trademarks and patents. Many of these agreements list different U.S. states in their choice-of-law clauses.

### iii.    Use of Trademarks in the United States

Polygroup Macau Limited does not formally license its SUMMER WAVES trademarks. Instead, it holds the marks and "allows" or "permits" other Polygroup companies and their customers to use them on products that are sold in the United States. Retailers in the United States buy SUMMER WAVES-branded products directly through Polygroup Services in the United States or indirectly from Polygroup factories located in other countries.

Polygroup Services has imported, marketed, and sold SUMMER WAVES-branded products—including inflatable pools, pool toys, and water slides—in the United States. It purchases these products from other Polygroup member companies. Polygroup Services operates the Polygroup websites in the United States and uses them to sell SUMMER WAVES-branded products. Polygroup Services employees are involved in directly marketing and accepting orders for products in the United States. Polygroup Services also provides customer service and support for SUMMER WAVES products. Polygroup Services and Polygroup Macau do not have a formal licensing agreement, and Polygroup Macau collects no royalties from Polygroup Services for its use of the marks.

Since 2014, other Polygroup companies, including Polygroup MCO, have sold SUMMER WAVES-branded products in

foreign countries to retailers that import and sell those products in the United States. Major U.S. retailers like Costco, Wal-Mart, Home Depot, Amazon, Target, and Michaels have sold hundreds of different products under Polygroup Macau's SUMMER WAVES marks.

Polygroup Macau asserts it lacks "any significant control, oversight, or involvement in its licensees' use of the SUMMER WAVES trademark in the United States." Polygroup Macau has not executed a written or oral agreement for the licensing or distribution of products using its marks and does not collect royalties for their use.

### iv.   *Marketing in the United States*

Polygroup's website tells consumers they can "find Polygroup® products at most major retailers around the world."[7] Its dedicated "Retail Partners" webpage prominently features major American retailers including Walmart, Sam's Club, Meijer, Ace Hardware, Lowe's, The Home Depot, Michaels, Kroger, Hobby Lobby, Costco, and J.C. Penny. Polygroup's website offers its customers a toll-free phone number to be answered by its "United States Customer Service" desk.

In early 2021, Polygroup Macau contacted Jekyll Island and asked to purchase the summerwaves.com domain name. Polygroup Macau's Georgia-barred general counsel testified that he spoke to Polygroup Services' California-based marketing employee

---

[7] *Our Retail Partners*, Polygroup, https://perma.cc/46CM-5KU7.

about buying the summerwaves.com domain name before this conversation. Polygroup Macau's counsel told Jekyll Island's general counsel the company was looking to develop its own website and sell SUMMER WAVES-branded products.

## B.  Procedural History

Jekyll Island sued Polygroup Macau in the Southern District of Georgia, asserting four claims: trademark infringement under 15 U.S.C. § 1114 (Count I); unfair competition under 15 U.S.C. § 1125(a) (Count II); common-law trademark infringement and unfair competition (Count III); and cancellation of trademark registrations based on fraud, under 15 U.S.C. § 1119 (Count IV). Jekyll Island sought an order enjoining Polygroup Macau and its subsidiaries, affiliates, and related companies from using or licensing the infringing SUMMER WAVES marks.[8]

Polygroup Macau moved to dismiss for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), or for failure to state a claim for trademark cancellation, Fed. R. Civ. P. 12(b)(6). Jekyll Island then moved for jurisdictional discovery, which the district court granted to resolve two disputes between the parties: (1) whether and to

---

[8] In trademark infringement cases, any member of the distribution chain, who knowingly participated in the infringing acts, can be sued as a joint tortfeasor. *See Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1312 (11th Cir. 2019). Before the district court, Jekyll Island explained it sued Polygroup Macau "to stop the infringement from the source." Jekyll Island's counsel elaborated: "I can't enjoin The Home Depot from licensing the trademark registration that belongs to the defendant here. I need an injunction. I need the licensing to stop. I need the distribution to stop."

what extent Polygroup "does business in the state of Georgia" by selling infringing goods, and (2) whether and to what extent Polygroup uses the SUMMER WAVES mark in United States commerce.

After jurisdictional discovery, but without holding an evidentiary hearing, the district court granted Polygroup Macau's renewed motion to dismiss for lack of personal jurisdiction.[9] It concluded Polygroup Macau lacked sufficient contacts with the State of Georgia or the United States as a whole to satisfy due process because Polygroup Macau did not directly sell infringing products on the U.S. market. Jekyll Island appealed.

## II.    Standard of Review

We review a district court's dismissal for lack of personal jurisdiction de novo. *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1292 (11th Cir. 2021). A plaintiff bears the burden of establishing a prima facie case of personal jurisdiction over the non-resident defendant. *Id.* If the defendant submits affidavit evidence contesting the basis for personal jurisdiction, "the burden shifts back to the plaintiff to produce evidence to support personal jurisdiction." *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1222 (11th Cir. 2023) (quotation marks omitted).

___

[9] Despite its concern with Polygroup Macau's inconsistent statements in *other* litigation, the district court denied Jekyll island's motion for sanctions because nothing suggested that Polygroup Macau purposefully misrepresented whether it marketed, distributed, and sold products in the United States in this case.

To the extent that "the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (quotation marks omitted). Whether the plaintiff satisfied the prima facie requirement "is a purely legal question; the district court does not weigh evidence or make credibility determinations." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364–65 (11th Cir. 2021).

### III.    Personal Jurisdiction Analysis

On appeal, Jekyll Island's primary basis for asserting personal jurisdiction over Polygroup Macau is Federal Rule of Civil Procedure 4(k)(2), also known as "the national long-arm statute." *E.g.*, *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). Rule 4(k)(2) allows courts to exercise personal jurisdiction over foreign defendants who have enough contacts with the United States, but not with a single state, to support personal jurisdiction. *See* 5 J. McCarthy, Trademarks and Unfair Competition § 32:45 (5th ed. 2025). To wield Rule 4(k)(2) against a foreign defendant, a plaintiff must show: (1) its claim "arises under federal law," (2) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction," and (3) "exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2); *see Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1307 (11th Cir. 2022).

Neither party disputes that Rule 4(k)(2)'s first two conditions are satisfied here: (1) Jekyll Island's claims arise under the Lanham Act (federal trademark law), and (2) Polygroup Macau denies that it is subject to jurisdiction in any state's court of general jurisdiction for these claims.[10] The only remaining question is whether the exercise of nationwide jurisdiction over Polygroup Macau is "consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

"Jurisdiction 'consistent with the Constitution and laws of the United States' is that which comports with due process." *Consol. Dev. Corp.*, 216 F.3d at 1291 (quoting Fed. R. Civ. P. 4(k)(2)). Due process protects "an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp.*

---

[10] The court "is not required to analyze the laws of all fifty states to ascertain whether any state court of general jurisdiction has jurisdiction over the defendant." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 n.22 (11th Cir. 2009). If "the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Id.* (quotation mark omitted and alterations adopted).

Both parties agree that Polygroup Macau did not identify any state's court "of general jurisdiction" where it would be subject to suit. Before the district court, Polygroup Macau agreed that Jekyll Island could bring its cancellation claim before the Trademark Trial and Appeal Board (TTAB) and appeal the TTAB's decision to the Eastern District of Virginia. *See* 28 U.S.C. § 1071(b)(4). But, despite the district court's contrary conclusion, this does not equate to "identif[ying] an alternate forum" for the cancellation claim because the TTAB is an administrative board, not a state court of general jurisdiction.

*v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). "The heart of this protection is fair warning—the Due Process Clause requires 'that the defendant's conduct and connection with the forum State be such that he should reasonably anticipate being haled into court there.'" *Diamond Crystal*, 593 F.3d at 1267 (alterations adopted) (quoting *Burger King*, 471 U.S. at 474).

Nationwide jurisdiction cases under Rule 4(k)(2) implicate the Due Process Clause of the Fifth Amendment, rather than the Fourteenth. *See Herederos*, 43 F.4th at 1310. The analysis under the two is mostly the same.[11] The only major difference is that where the Fifth Amendment applies, the court weighs the defendant's contacts with the United States as a whole, rather than with a single state. *Id*.

Because Polygroup Macau is not "at home" in the United States,[12] due process limits the jurisdiction of United States courts

---

[11] This is true for three main reasons: (1) the operative language of the two clauses is "materially identical," (2) our previous case law has used the two interchangeably, and (3) adopting a different standard for Fifth Amendment cases would create "unnecessary tension" with our precedents. *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1308 (11th Cir. 2022).

[12] A court may assert general jurisdiction over a foreign corporation and "hear any and all claims against it" only when the corporation is "essentially at home in the forum." *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (quotation marks omitted and alterations adopted). General jurisdiction is not appropriate here as the United States is neither Polygroup Macau's place of incorporation nor its principal place of business—"the paradigm forums" for the exercise of

to suits that "arise out of or relate to [its] contacts with the *forum*." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017) (quotation marks omitted and alterations adopted). This is known as specific (or case-linked) jurisdiction. *Id.* To exercise specific jurisdiction, the "defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation." *Diamond Crystal*, 593 F.3d at 1267.

The specific jurisdiction inquiry proceeds as follows. First, Jekyll Island must establish: (1) Polygroup Macau purposefully availed itself of the laws of the United States, and (2) Jekyll Island's claims arise out of or relate to at least one of Polygroup Macau's contacts with the United States. *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022). If successful, Polygroup Macau must make a "'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* (quoting *Diamond Crystal*, 593 F.3d at 1267).

### A.  *Polygroup Macau's Purposeful Availment*

A corporation that chooses to avail itself of the protection of a forum state's laws by engaging in business in that state must assume certain risks—such as the risk of litigation. *See, e.g., Int'l*

---

general jurisdiction. *See BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (internal quotation marks omitted). Nor is this an "exceptional case," where Polygroup Macau's operations in the United States are "so substantial and of such a nature" as to render it "at home" here. *Id.* (quotation marks omitted).

*Shoe*, 326 U.S. at 319. A court may exercise specific personal jurisdiction over nonresident defendants who "purposefully direct[]" their "activities toward forum residents" or "purposefully derive benefit" from their in-forum activities. *Burger King*, 471 U.S. at 473–74 (quotation marks omitted).

Specific jurisdiction is "founded . . . on an idea of reciprocity between a defendant and a State: When (but only when) a company exercises the privilege of conducting activities within a state—thus enjoying the benefits and protection of its laws—the State may hold the company to account for related misconduct." *Ford Motor Co.*, 592 U.S. at 360 (internal quotation marks omitted and alterations adopted). So long as a defendant "enjoys the benefits and protection of [a forum's] laws—the enforcement of contracts, the defense of property, the resulting formation of effective markets"—it must answer in that forum's courts for related harms. *Id.* at 367–68.

"At the outset, we underscore that the minimum contacts analysis is immune to solution by checklist." *Diamond Crystal*, 593 F.3d at 1267–68 (internal quotation marks omitted). A broad set of a corporate defendant's "'efforts . . . to serve, directly or indirectly, the market for its product'" in the forum contacts are "relevant in assessing the link" between the forum and the suit. *Ford Motor Co.*, 592 U.S. at 363, 371 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Such efforts include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a

distributor who has agreed to serve as the sales agent in the forum." *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (1987) (plurality opinion).[13]

Looking to Polygroup Macau's efforts to serve the U.S. market, we find that the company enjoyed the benefits and protections of U.S. law by: (1) registering and maintaining dozens of trademarks with the USPTO, and enforcing its rights in U.S. courts; (2) "allowing" its sister companies and their customers unrestricted use of those trademarks to sell products in the United States; and (3) using its trademarks in marketing specifically targeted at United States consumers. We address each category of contacts in turn.

### i. Trademark Registration

A foreign defendant "who has sought and obtained a property interest from a U.S. agency has purposefully availed itself of the laws of the United States." *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1416 (Fed. Cir. 2009). As then-Judge Ginsburg explained:

> By registering a patent in the United States Patent and Trademark Office, a party residing abroad purposefully avails itself of the benefits and protections patent registration in this country affords. It is therefore fair and reasonable to require such a party to respond here—*i.e.*, in federal court in our nation's capital,

---

[13] The *Asahi* plurality adopted a "more stringent" analysis for "the placement of a product into the stream of commerce" than the binding opinion. *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 & n.17 (11th Cir. 1993) (quoting *Asahi*, 480 U.S. at 112).

>      where the party has registered its patents—in pro-
>      ceedings, whether arising under federal or state law,
>      concerning the U.S.-registered patent.

*Nat'l Pat. Dev. Corp. v. T.J. Smith & Nephew Ltd.*, 877 F.2d 1003, 1009–10 (D.C. Cir. 1989) (en banc) (citations and footnote omitted); *see also Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1353 (Fed. Cir. 2002) ("Obtaining such a patent is a meaningful contact with the United States; it requires a patentee purposefully to avail him or herself of a significant benefit of United States law." (citing *T.J. Smith & Nephew Ltd.*, 877 F.2d at 1010)).

While these cases addressed patents rather than trademarks, "[p]ersonal jurisdiction is not an area in which Congress has enacted a patent-specific statute that placed patent infringement cases in a class by themselves." *Trimble Inc. v. PerDiemCo LLC*, 997 F.3d 1147, 1154 (Fed. Cir. 2021) (internal quotation marks omitted). If anything, the differences between patents and trademarks bolster our conclusion that a trademark registration is a purposeful effort to avail oneself of the benefits of doing business in the United States. A federal trademark *registration* does not "create" a trademark in the way that a federal patent *grant* creates the exclusive rights to make, use, and sell the patented technology. 4 McCarthy § 31:65. A trademark registrant must show that he is already using the mark in U.S. commerce to identify and distinguish goods or intends to soon. *See* 15 U.S.C. §§ 1051, 1052.

The Eleventh Circuit has not considered whether registration of a trademark, by itself, is enough to show purposeful availment in an infringement case. District courts across the country are in "some disagreement" on this point. *See Shenzhen Wanfan Tech. Co. v. Orbital Structures Pty Ltd.*, No. 23-CV-02330, 2024 WL 325339, at *6 (N.D. Ill. Jan. 29, 2024) (collecting cases). But we agree with our sister circuit that trademark registration can be "considered compelling evidence that [the defendant] satisfied the purposeful availment or direction test." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 982 n.4 (9th Cir. 2021) (citing *T.J. Smith & Nephew Ltd.*, 877 F.2d at 1009–10). Like registering a patent, making the deliberate decision to register a trademark shows an intent to capitalize on the benefits and protections that trademark registration in this country affords. *Cf. T.J. Smith & Nephew Ltd.*, 877 F.2d at 1009–10.

Even if registration is not enough, our sister circuits have looked to other registration-related contacts, such as hiring an attorney or agent in the forum to support a finding of purposeful availment. *See Trimble*, 997 F.3d at 1155. The D.C. Circuit noted that the defendant did not just register its patents, but "at least four times availed itself of its rights under United States patent registrations by seeking to enforce the patents against infringers." *T.J. Smith & Nephew*, 877 F.2d at 1009 n.9.

Broadly speaking, efforts to certify or register products with U.S. agencies demonstrate that a defendant "sought out the benefits afforded by this country's regulatory regime." *Ayla*, 11 F.4th at 982. Asserting personal jurisdiction over a foreign company that

advertised that its products were "FDA approved," the Ninth Circuit reasoned that "[o]btaining and advertising approval by the FDA, a United States regulatory agency, is an appeal specifically to American consumers for whom the acronym 'FDA' has meaning." *Id.* at 982–83. The Ninth Circuit distinguished its case from *Goodyear*, where the Supreme Court found no personal jurisdiction over a foreign tire company, even though its products had markings required for sale in the United States by the Department of Transportation (DOT). *Id.* (citing 564 U.S. at 922). In *Goodyear,* the parties presented evidence that the DOT encouraged foreign companies to use its markings as evidence of product safety, even if those products weren't "destined for sale in the United States." 564 U.S. at 923 n.2. But the company in *Ayla* "offer[ed] no other explanation" besides appealing to American consumers for seeking and advertising FDA approval. 11 F.4th 982–83.

By registering more than sixty trademarks with the USPTO, Polygroup Macau has purposefully availed itself of the benefits and protections of United States law. As the owner of registered trademarks in the United States, Polygroup Macau enjoys many "valuable benefits," *Iancu v. Brunetti*, 588 U.S. 388, 391 (2019), that are "useful in infringement litigation" in the United States, *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 146 (2023). Registration is "prima facie evidence of the validity of the registered mark," 15 U.S.C. § 1057(b), and a precondition for a mark to become

23-11415                Opinion of the Court                21

"incontestable," *id*. §§ 1065, 1115(b).[14] A trademark owner may prevent foreign manufacturers from importing articles bearing an infringing mark into the United States. *See* 15 U.S.C. § 1124.

The process of trademark registration required Polygroup Macau to "deliberately engage[] in significant activities" within the United States and "create[] continuing obligations" here. *See Diamond Crystal*, 593 F.3d at 1268. To register each mark, Polygroup Macau paid a fee and filed an application with the USPTO, where it attested to and demonstrated how the mark was used in commerce in the United States. *See* 15 U.S.C. § 1051(a). To maintain its registration, Polygroup Macau must periodically file affidavits or declarations of use or excusable nonuse of its marks in United States commerce. 15 U.S.C. § 1058(b)(1). And, as a foreign domiciliary, Polygroup Macau must appoint and be represented by an attorney who is licensed in the United States. *See* 37 C.F.R. §§ 2.11(a), 2.32 (a)(4); *see also* 15 U.S.C. § 1051(e) (authorizing service of process on foreign domiciliaries for "proceedings affecting the mark" with an appointed representative in the United States or the director of the USPTO).[15]

---

[14] "Incontestability is a powerful protection" and completely forecloses certain challenges to the mark's validity. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 159–60 (2015); *see also*, *e.g.*, *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985); 37 C.F.R. § 2.167(d), (e) (noting requirements for incontestability). On April 4, 2023, Polygroup Macau filed a Declaration of Incontestability for the SUMMER WAVES mark—which it later withdrew.

[15] The Federal Circuit found a similar requirement for foreign domiciled patentees "represent[ed] an important Congressional judgment that in exchange

And there is no explanation for Polygroup Macau's decision to register trademarks with the USPTO *other than* to seek out the "benefits afforded by this country's regulatory regime." *Cf. Ayla, LLC*, 11 F.4th at 982. A registered trademark in one country is "regarded as independent of marks registered in other countries." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 426–27 (2023) (collecting treaty provisions). Though international treaties "provide[] mechanisms for trademark holders to secure trademark protection in other countries under the domestic law of those countries," a trademark has a separate existence in each country where it is registered or legally recognized as a mark. *Id.* at 426–27. Polygroup Macau's U.S. trademarks not only receive no legal protections outside of the United States—they do not legally *exist* outside of the United States.[16]

At minimum, Polygroup Macau's efforts to secure and defend its property interests, exclusively recognized and protected under U.S. law, serve as compelling evidence that it sought out the benefits afforded to it by U.S. law. And Polygroup Macau has done

for obtaining the benefits of a United States patent, it is appropriate to require foreign patentees to submit to broader jurisdiction in United States Federal Court." *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1353 (Fed. Cir. 2002) (citing 35 U.S.C. § 293).

[16] The Lanham Act, which implements international "treaties and conventions respecting trademarks," 15 U.S.C. § 1127, mandates that registration of a trademark in the United States "'be independent of the registration in the country of origin,' and that the rights of that mark in the United States are governed by domestic law." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 427 (2023) (quoting 15 U.S.C. § 1126(f)).

more than just passively register trademarks and patents in the United States. It has deliberately and repeatedly sought out protections by licensing and enforcing its intellectual property rights. And it has allowed related companies and their customers to use those marks to sell the infringing products at issue.

### ii.  Sale of Products in the United States

Due process does not prohibit us from exercising personal jurisdiction over a nonresident defendant "because of its own choices" to contract with American companies or market its products to U.S. residents. *See SkyHop Techs., Inc.*, 58 F.4th at 1230. By registering, selling, and advertising a trademarked product in the United States, a mark owner avails itself of the protections afforded by the United States' trademark protection laws and exposes itself to potential litigation should it be accused of infringement. *See, e.g.*, *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1357–58 (11th Cir. 2013); *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 165–66 (2d. Cir. 2010); *see also Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1566–67 (Fed. Cir. 1994) (collecting circuit cases).

Polygroup Macau "allowed" or "permitted" its SUMMER WAVES trademarks to be used to sell products (1) directly in the United States through Polygroup Services; and (2) indirectly through other Polygroup companies, like its subsidiary Polygroup MCO, selling SUMMER WAVES products overseas to global retailers that later imported them into the country. Polygroup Macau has also entered into several written licensing agreements and assignments for its other trademarks and patents with U.S. companies

and retailers. Through both sales channels, Polygroup sold hundreds of different SUMMER WAVES-branded products through dozens of major U.S. retailers.

As an initial matter, both categories of sales are relevant. It does not matter whether a foreign manufacturer sells its products directly to consumers in the forum, or indirectly through a subsidiary, licensee, or independent distributor. *See, e.g.*, *Ford Motor Co.*, 592 U.S. at 363–65; *Daimler AG*, 571 U.S. at 135 n.13; *Cable/Home Commc'n Corp. v. Network Prods.*, 902 F.2d 829, 858 (11th Cir. 1990). "If *International Shoe* stands for anything it is that a truly interstate or international business may not shield itself from suit by a careful but formalistic structuring of its business dealings." *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993) (quotation marks omitted and alterations adopted). Jurisdiction is proper so long as the foreign defendant, through its business partners, "made deliberate decisions to market their products in [a] forum state," and either "indirectly derived substantial benefit from the forum state or had a reasonable expectation of doing so." *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 299–300 (3d Cir. 1985).

Using Polygroup Macau's registered trademarks, the "Polygroup® family of companies" heavily markets its products to United States consumers. Polygroup's website shows that its products were "clearly calculated" to reach the U.S. market. Though Polygroup's website tells consumers they can "find Polygroup® products at most major retailers around the world," American retailers are some of the first listed on its dedicated Retail Partners

page. It has sold hundreds of SUMMER WAVES-branded products to U.S. residents through these major retailers.

But Polygroup Macau maintains that it exercised no control over the marketing, selling, importing, and distributing of the infringing products in the United States by the other Polygroup entities. Although the district court characterized Polygroup Macau's use of the SUMMER WAVES marks as "licensing," the parties executed no formal agreements, and Polygroup Macau received no royalties for the marks' use. Jekyll Island argues that this shows an even closer relationship between the two Polygroup companies; Polygroup Macau argues that it shows the opposite.

A business relationship has the "necessary ingredients for an exercise of jurisdiction" so long as the entities "acting in consort, placed the [injury-causing product] in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Beverly Hills Fan*, 21 F.3d at 1566. We must take a "'highly realistic approach' that focuses on the substance of the transaction: prior negotiations, contemplated future consequences, the terms of the contract, and the actual course of dealing." *Diamond Crystal*, 593 F.3d at 1268 (citing *Burger King*, 471 U.S. at 479).

For example, when a "resident corporation acts on behalf of [its] foreign affiliates," the court may extend jurisdiction to the foreign affiliate if the affiliated domestic corporation "manifests no separate corporate interests of its own and functions solely to

achieve the purpose of the dominant corporation." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1273 (11th Cir. 2002). Federal courts "consistently acknowledge[]" that courts may exercise personal jurisdiction over foreign corporation, based on the contacts of its resident corporation "alter ego." *United States ex rel. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1355 (11th Cir. 2021) (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)); *see also Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 433–34 (4th Cir. 2011) (collecting cases). "The theory underlying these cases is that, because the two corporations (or the corporation and its individual alter ego) are the same entity, the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the purposes of the . . . due process analysis." *Mortg. Invs. Corp.*, 987 F.3d at 1355 (quotation marks omitted).

We have upheld this approach to assessing business relationships "under the stricter standard of general jurisdiction." *Consol. Dev. Corp.*, 216 F.3d at 1292. In *Meier*, we found personal jurisdiction over foreign corporations whose "financial ties" with their local subsidiaries "suggest[ed] a relationship far beyond service contracts." 288 F.3d at 1273. The companies shared bank accounts, paid for advertising and other expenses, and the subsidiaries "did not undertake any business activity for anyone" other than the parent company. *Id.* Looking to *Meier* in *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, we asserted general jurisdiction over a foreign corporation that "engaged in substantial and not isolated activity" within the forum state through both "direct contacts" with the forum and "indirect contacts" through an affiliated in-state

entity. 447 F.3d 1357, 1363 (11th Cir. 2006). The local entity not only "operate[d] solely" as the foreign company's advertising and booking company, but the foreign defendant maintained "numerous separate commercial relationships" of its own in the forum with lawyers, insurance brokers, and vendors. *Id.* at 1362.

Even an arm's length intellectual property licensing agreement with a party that "resides or regularly does business in the forum" may support a finding of minimum contacts. *New World Int'l, Inc. v. Ford Glob. Techs., LLC*, 859 F.3d 1032, 1038 (Fed. Cir. 2017). Like other contracts, this requires close examination of the terms of the license agreement. *Breckenridge Pharm., Inc. v. Metabolite Lab'ys, Inc.*, 444 F.3d 1356, 1366 (Fed. Cir. 2006). Specific jurisdiction may not arise solely from a licensor signing a non-exclusive contract with third parties to sell allegedly infringing products in the forum state. *Diece-Lisa Indus., Inc. v. Disney Enters., Inc.*, 943 F.3d 239, 253 (5th Cir. 2019).

Jurisdiction requires something more in the terms of the agreement or course of dealing that connects the defendant to the jurisdiction. *Diamond Crystal*, 593 F.3d at 1268–69. Such acts include where the licensor and licensee coordinate in litigating infringement claims in the forum and are often represented jointly by counsel and whether the licensing agreement creates continuing obligations for the licensor in the forum state. *Breckenridge Pharm., Inc.*, 444 F.3d at 1363–67.[17] In short, the license agreement must have

---

[17] Before the Supreme Court's 2021 decision in *Ford,* the Federal Circuit took a narrower view of when a defendant's licensing activities could subject it to

28                    Opinion of the Court                    23-11415

"not only *contemplated* an ongoing relationship" beyond royalty payments but "*actually resulted* in such a relationship." *Id.* at 1367.

Taking the "highly realistic approach" required by *Burger King*, we find that Polygroup Macau purposefully availed itself of the U.S. market through both its "direct contacts" with the forum and "indirect contacts" through its relationship with the other Polygroup entities. *Stubbs*, 447 F.3d at 1362–63. Polygroup Macau "made deliberate decisions" to register trademarks in the United States for its sister companies to use, and in turn its sister companies' use allowed Polygroup Macau to obtain "substantial benefit[s]" afforded to it by United States trademark laws. *See Max Daetwyler*, 762 F.2d at 299–300.

Whether based on implied contract or corporate alter ego, Polygroup Macau's "ties" with Polygroup Services and Polygroup MCO suggest "a relationship far beyond service contracts." *Meier*, 288 F.3d at 1273. By granting its sister companies unfettered access to its marks to sell products in the United States, Polygroup Macau knew or should have known the consequences could include potential trademark infringement liability and cancellation.

---

personal jurisdiction, often limiting it to relationships with exclusive licensees. *See Trimble*, 997 F.3d at 1156. Many other circuits applied this approach. *See, e.g.*, *Diece-Lisa Indus., Inc. v. Disney Enters., Inc.*, 943 F.3d 239, 253 (5th Cir. 2019). But the Federal Circuit recognized that, after *Ford*, "a broad set of a defendant's contacts with a forum are relevant to the minimum contacts analysis," and nonexclusive licenses may serve as evidence of broader efforts to exploit a market. *Trimble*, 997 F.3d at 1156.

Though the corporate form in this case is opposite from that in *Meier* and *Stubbs*, where a local entity "operate[s] solely" on the foreign company's behalf, the substance of the relationship is the same. Polygroup Macau's characterization of its business activities suggest its "separate corporate status is formal only and without any semblance of individual identity." *Mortg. Invs. Corp.*, 987 F.3d at 1355 (quoting *Stubbs*, 447 F.3d at 1272). In its own words, its "only role within the group of related Polygroup companies is holding certain intellectual property assets . . . and making these assets available for use by other related Polygroup Companies." [**Interrog. No. 23**]

The Polygroup companies "conduct business in the United States" through Polygroup Services. Polygroup Services employees have signed agreements in the United States on Polygroup Macau's behalf, and were involved in trademark registration, licensing, marketing, and litigation decisions. Polygroup Services in turn sold products in the United States using Polygroup Macau's marks and "establish[ed] channels for providing regular advice to customers in the [United States]" for products bearing Polygroup Macau's marks. *See Asahi*, 480 U.S. at 112.

At the very least, Polygroup Macau's "licensing" arrangements with its sister companies go well "beyond the receipt of royalty income." *Breckenridge Pharm., Inc.*, 444 F.3d at 1366. In fact, there is no royalty income to speak of. The other Polygroup entities not only sell products under the SUMMER WAVES marks in the United States without paying for them, but they pay for Polygroup

30                     Opinion of the Court                 23-11415

Macau's U.S. trademark registrations and litigation and are often represented jointly by in-house and external counsel.

Still, Polygroup Macau maintains that it lacks any significant control, oversight, or involvement in the use of the SUMMER WAVES trademarks in U.S. commerce. But the mechanics of trademark registration and licensing show that Polygroup Macau should "reasonably have anticipated" being brought into court for how the related Polygroup entities use its marks. *Beverly Hills Fan Co.*, 21 F.3d at 1566.

Polygroup Macau registered the three SUMMER WAVES marks under Lanham Act § 1(a), the filing basis for marks that are already used in commerce. *See* 15 U.S.C. § 1051(a); *Trademark Manual of Examining Procedure* (TMEP) §§ 806.01(a), 901 (Nov. 2024). To register, USPTO regulations required Polygroup Macau to verify in an affidavit or declaration that the marks were used in commerce on or in connection with the goods or services in the application, provide the dates the mark was first used in commerce, and submit a "specimen" showing how the mark is used in commerce. *See* 37 C.F.R. §§ 2.2(k)(1), 2.34(a); TMEP §§ 904–904.07(b), 1301.04. Polygroup Macau completed this process for the three SUMMER WAVES marks and dozens of others, despite having never sold products in the United States.

On the SUMMER WAVES trademark applications, as the CEO of Polygroup Macau, Lewis Cheng attested that Polygroup Macau, its "related company," or a "controlled licensee" was using the mark "in commerce on or in connection with the goods or

services in the application."[18] Because Polygroup Macau was not using those marks itself, it is safe to assume that it not only knew the other Polygroup companies were using them but relied on this use to obtain and maintain its trademark rights. As a trademark owner, Polygroup Macau has a duty to supervise third-party use of its trademark, or risk having its mark cancelled. *See* 15 U.S.C. § 1064(5)(A); *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519 (11th Cir. 1992). The "related company" provision recognizes the "inherent" nature of certain entity relationships may presume that the mark owner is adequately controlling the nature and quality of goods sold by the related company, "without the need for a license or other agreement." *Furnishings v. Enterprises*, 118 U.S.P.Q.2d 1413 (T.T.A.B. 2016).

So if we take Polygroup Macau at its word that it does not sell products using the SUMMER WAVES marks, we are left with three possible conclusions: (1) Polygroup Macau lied to the USPTO and did not make the required use of its marks in commerce; (2) Polygroup Macau has so*me control* over the other Polygroup entities' use of the marks, even without a formal agreement; or (3) Polygroup Macau is exercising no control over the marks' use whatsoever and risks having them cancelled. *See* 15 U.S.C. § 1064(5)(A). The first is the basis of Jekyll Island's cancellation claim. The third seems unlikely, given that Polygroup Macau exists

---

[18] The USPTO does not require an application to specify whether the applied-for mark is being used by the applicant or by one or more related companies. *See, e.g.*, *Furnishings v. Enterprises*, 118 U.S.P.Q.2d 1413 (T.T.A.B. 2016).

solely to hold intellectual property. That leaves us with the most likely scenario—Polygroup Macau exercises a certain level of control over the use of the marks by its sister companies, even without a formal agreement. At minimum, because Polygroup Macau's U.S. trademark registrations and continued protections depend on the marks' use in U.S. commerce, and Polygroup Macau does not use the marks itself, it should have known that they would be used in United States commerce by related Polygroup companies. *See World-Wide Volkswagen*, 444 U.S. at 297.

In sum, we find that Polygroup Macau's contacts "taken collectively," *Del Valle*, 56 F.4th at 1277, establish that it has "continuously and deliberately exploited" the United States market, *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984). As Polygroup Macau enjoyed the "benefits and protection" of the United States' laws to secure and defend its intellectual property, enforce its licensing agreements, and secure effective markets for its products, it must answer in U.S. courts for related harms. *Ford Motor Co.*, 592 U.S. at 367–68.

## B.  Relationship Between Polygroup Macau's Contacts & Jekyll Island's Claims

We turn now to whether Jekyll Island's claims "arise out of or relate to" Polygroup Macau's contacts with the United States. *Ford Motor Co.*, 592 U.S. at 361–62 (emphasis omitted). The "first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Id*. at 362.

The district court focused on the "first half," concluding it lacked personal jurisdiction over Polygroup Macau because of "the attenuated causal connection" or lack of "substantial causal relationship" between Polygroup Macau's registration and licensing of the SUMMER WAVES marks in the United States and Jekyll Island's infringement claims. The court asserted that "[a]t minimum, for a suit to arise out of or be related to a contact, 'the contact must be a 'but-for' cause of the tort.'" 2023 WL 2632813, at *7 (quoting *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010)). And, it reasoned, that because trademark infringement and unfair competition claims require *use* in commerce, the other companies' *use* of Polygroup Macau's SUMMER WAVES marks was the "direct logical precedent" to Jekyll Island's claims—not Polygroup Macau's registration or licensing of an infringing mark. *Id.* at *9–11.

On appeal, both parties recognize that the district court's strict "but-for causation" standard was erroneous.[19] Shortly after

[19] Polygroup Macau argues instead that Jekyll Island invited the district court's error. We are not convinced. "The invited error doctrine stands for the common sense proposition that someone who invites a court down the primrose path to error should not be heard to complain that the court accepted its invitation and went down that path." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 (11th Cir. 2011). We have "traditionally construed invited errors narrowly, so as to preserve the opportunity for appellate review in close cases." *United States v. Burnette*, 65 F.4th 591, 600–01 (11th Cir. 2023).

Polygroup Macau does not point to "unambiguous statements or representations" by Jekyll Island inviting the district court to apply a strictly but-for standard. *See Cherry v. Dometic Corp.*, 986 F.3d 1296, 1301 (11th Cir. 2021). And the misapplication of newly abrogated precedent is not the sort of "textbook" case in which we have applied the invited error doctrine. *See, e.g., United States v.*

the parties began litigating, the Supreme Court expressly denounced this approach, clarifying that it has "never framed the specific jurisdiction inquiry as always requiring proof of causation—i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct." *Ford Motor Co.*, 592 U.S. at 362. "None of [the Court's] precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." *Id.*

In *Ford*, Montana and Minnesota residents sued Ford in their respective states, alleging that defective Ford vehicles injured them. *Id.* at 356. Ford argued that the plaintiffs' claims did not arise out of or relate to Ford's contacts in those states because Ford did not design, manufacture, or sell the injury-causing vehicles in either state. *Id.* Instead, the "company sold the specific cars involved in these crashes outside the forum States, with consumers later selling them to the States' residents." *Id.* at 366.

The Supreme Court disagreed, finding "the case is not over even if, as Ford argues, a causal test would put jurisdiction in only the States of first sale, manufacture, and design." *Id.* at 362. Rather

---

*Maradiaga*, 987 F.3d 1315, 1322 (11th Cir. 2021) (jury instruction language); *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1249 (11th Cir. 2006) (waiving personal jurisdiction). Federal courts must apply the correct legal standard, regardless of the interpretations advanced by parties. *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *cf. United States v. Duldulao*, 87 F.4th 1239, 1255 (11th Cir. 2023) (recognizing exception to invited error doctrine where a party "relied on settled law that changed while the case was on appeal").

than focus on the contacts related to the specific vehicles, the Court focused on the broader efforts by Ford to sell similar vehicles in each state. *Id.* Ford's "veritable truckload of contacts" with the two states—while not directly related to the underlying suit—were still "relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit." *Id.* at 371. The Court emphasized Ford's extensive marketing of those models in the forum states through "billboards, TV and radio spots, print ads, and direct mail" and its efforts to maintain, service, and repair those models in those states. *Id.* at 365.

Dispensing with the need to show a strictly "causal relationship," we find that Polygroup Macau's relevant contacts with the United States establish a "strong 'relationship among the defendant, the forum, and the litigation'" to support the court's exercise of personal jurisdiction in this case. *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). The relevant contacts here are Polygroup Macau's "own choices" to register trademarks with the USPTO, rely on its affiliated companies' use of those marks in U.S. commerce to obtain trademark protection, and to license and enforce its trademark rights in U.S. courts. *SkyHop Techs*, 58 F.4th at 1230. And these contacts of obtaining and defending dozens of U.S. trademarks share a common link with the litigation before us: Jekyll Island's claims for trademark infringement, unfair competition, and cancellation under the Lanham Act.

Begin with Jekyll Island's cancellation for fraud claim under 15 U.S.C § 1119. To help remedy trademark violations, a district

court may cancel a federally registered trademark if a plaintiff shows (1) it is likely to be damaged by the infringer's continued use of the infringing mark, and (2) that there were valid grounds for discontinuing registration. *See PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1171 (11th Cir. 2019). A party may petition to cancel a registered mark by alleging the registration was obtained fraudulently. *See* 15 U.S.C. § 1064(3). "Fraud occurs when an applicant knowingly makes false, material representations of fact in connection with an application for a registered mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008).

Jekyll Island's trademark cancellation claim arises directly from an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *SkyHop Techs., Inc.*, 58 F.4th at 1229 (quotation marks omitted). Polygroup Macau chose to register its SUMMER WAVES trademarks in the United States, and in the process, it made the required declarations and demonstrations of the marks' use in commerce. As Jekyll Island alleges the same declarations were false and material to the USPTO's decision to approve the registrations, the claim arises directly out of Polygroup Macau's purposeful efforts to secure a U.S. property interest.

The relationship to Jekyll Island's infringement and unfair competition claims is less direct, but still "close enough to support specific jurisdiction." *Ford Motor Co.*, 592 U.S. at 371. Both the infringement and unfair competition provisions of the Lanham Act prohibit the unauthorized use "in commerce" of a protected

trademark when that use "is likely to cause confusion" as to the source, origin, or sponsorship of goods. 15 U.S.C. §§ 1114(1)(a), 1125(a)(1). Polygroup Macau argues that there is "good reason" to hesitate before "equating trademark registration with the availability of nationwide personal jurisdiction over a foreign registrant" because trademark-infringement and unfair-competition claims turn on the *use* of a trademark in commerce, not registration or licensing. This argument is unavailing for two related reasons.

First, use in commerce is a prerequisite to registration. Polygroup Macau could not have registered its trademarks without demonstrating how it, a related company, or a controlled licensee uses the mark in commerce. *See* 15 U.S.C. §§ 1051(a)(1), 1055; *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 143 (2015) ("The usages listed in the application—*i.e.*, those goods on which the mark appears along with, if applicable, their channels of distribution—are critical."). As Polygroup Macau maintains that it did not use the SUMMER WAVES marks in commerce, it could not have acquired and maintained its trademarks rights without attesting to and proving use in commerce by other "related" Polygroup companies or controlled licensees. *See* 15 U.S.C. §§ 1055, 1127. Polygroup Macau may not have used the marks, but it relied on that use to obtain its trademark rights.

Second, "the kind of 'use'" Polygroup Macau needed to show to acquire registerable trademark rights is narrower than the use required to infringe them. *See N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1220 n.7 (11th Cir. 2008). For a trademark

to qualify as "used in commerce" for registration purposes, the mark must be "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto." *See* 15 U.S.C. § 1127 (noting its definitions apply "unless the contrary is plainly apparent from the context"). By contrast, infringement under § 1114(1) merely requires a use "in connection with the sale, offering for sale, distributing, or advertising of any goods." *See N. Am. Med. Corp.*, 522 F.3d at 1220 n.7.

Under the infringement and unfair competition provisions, "use in commerce" includes not just sale of infringing goods but "any marketing, advertising, and distributing activities." *See Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 99 F.4th 1150, 1167 (10th Cir. 2024) (citing 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)). And the Supreme Court "has long recognized" that liability for trademark infringement "'can extend beyond those who actually mislabel goods'" to those who knowingly assist or participate in infringing activities. *Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1274 (11th Cir. 2015) (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 853 (1982)). By obtaining a property right in the United States that required it to demonstrate how the mark was used in commerce, allowing its sister companies unfettered access to use its marks, and relying on their use to maintain its trademark rights, Polygroup Macau should "reasonably anticipate" having to answer in U.S. courts for infringing uses of those marks by its sister companies. *See Ford Motor Co.*, 592 U.S. at 364.

### C. Fairness

Our third and final inquiry asks whether the exercise of jurisdiction in the United States accords with "traditional notions of fair play and substantial justice." *SkyHop Techs.*, 58 F.4th at 1231 (quotation marks omitted). We consider the burden on the defendant, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining relief, and the judicial system's shared interest in resolving the dispute. *Del Valle*, 56 F. 4th at 1277.

Because modern transportation and communications have made it much less burdensome for a party sued to defend himself in a forum where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity. *See World-Wide Volkswagen*, 444 U.S. at 293. It is fair and reasonable to require Polygroup Macau to respond in federal court in the United States, where Polygroup Macau registered its trademarks and attested to their use in commerce. Polygroup Macau's asserted burden is slight, especially when weighed against the fact that a U.S. court is the only forum that could resolve a U.S. trademark dispute.

Polygroup Macau "has shown its familiarity with the United States administrative and legal process" by maintaining its substantial portfolio of patents and trademarks with the USPTO and engaging in litigation throughout the United States as a plaintiff and a defendant. *Cf. Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528, 545 (6th Cir. 1993). Though this prior activity does not "lessen the burden" on Polygroup Macau, it does indicate that Polygroup Macau

"will not be lost in our complex legal system" and "shows a willingness . . . to expend substantial resources to exploit the United States market." *Id.*

We see no unfairness in requiring Polygroup Macau to litigate in Georgia. Polygroup Macau's general counsel is barred in Georgia and the firm it has used as outside counsel for several decades is headquartered in Atlanta. And it has a sister entity headquartered in the United States that has done business on its behalf and funds any infringement litigation arising out of the use of its trademarks in the United States.

On the other hand, the United States has a "significant interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. *Hustler Magazine, Inc.*, 465 U.S. at 776. As owners of U.S. trademarks, both parties have a legally protected interest in the subject matter under U.S. law. And the United States has an interest in being the final arbiter on trademark rights, ownership, and infringement within its borders. Neither trademark legally exists outside of the United States nor receives protections outside of the United States.

Finally, allowing the court to resolve the claim against Polygroup Macau and potentially "stop the infringement from the source" protects Jekyll Island's interest in avoiding multiple suits concerning the same basic facts against Polygroup Macau's various "licensees" and the public interest in efficiently using judicial resources.

Considering the strong interest of the United States in resolving disputes about property interests that exist exclusively within its borders, Polygroup Macau has not made the "compelling case" that the exercise of jurisdiction is improper. *See Louis Vuitton*, 736 F.3d at 1355 (quotation marks omitted). And it is in the best interest of Jekyll Island, the United States, and U.S. courts to resolve this dispute efficiently in the only forum that can hear it.

## IV.    Conclusion

While Polygroup Macau seeks all the benefits of United States law to protect its intellectual property, it attempts to use its corporate structure to avoid accountability when it violates the rights of others. But Polygroup Macau's acknowledgment of United States law cannot depend on its status as a plaintiff or defendant. And it certainly may not wield the Due Process Clause "to avoid interstate obligations" it has "voluntarily assumed." *Burger King Corp.*, 471 U.S. at 474.

We **REVERSE** the district court's dismissal for lack of personal jurisdiction over Polygroup Macau and **REMAND** for consideration of Jekyll Island's claims on the merits.